Good morning, Your Honors. May it please the Court, my name is Jean Colaccia and I'm here to represent the defendant and the appellant, Mr. Jerry McCord. I would like to focus oral argument on the contempt issue. The district court held my client in contempt and since that's the big ticket item for him, I'd like to focus oral argument on the contempt issue. I read Judge Elderset's book on appellate advocacy before I came here and the one thing that really connected with me was that Judge Elderset's book, he said the court knows the law, counsel knows the facts. That's especially true in my case because my bar numbers on my brief, it's anonymous print. But I know the facts of this case and so I'd like to concentrate on the facts. But before I get into the facts, does the court have any specific questions that you'd like to ask of me? I really have a question about the TRO, which is of course the foundation for the contempt order. And my question really is this. This is not unlike TROs that are seen all the time in intellectual property cases and they usually contain the kitchen sink about what you should and shouldn't do, including anything confusingly similar and, you know, buy, sell, sit upon and blah, blah, blah, blah, blah. But I take it it's your contention that it's basically too broad. Is that correct? Well, maybe it wouldn't be too broad if there had been some dialogue between these parties before this. But you have to take this into account that this was a person who had been making these air race souvenirs for basically for 12 years before this litigation began. There had been no dialogue whatsoever between them. And so he gets – Had there been one cease and desist letter? Pardon? Had there been one cease and desist letter? There had been nothing. There was – I thought there was a call or something from an attorney in 19 – There was some vague reference to a call by an attorney. There was no evidence that was presented by a trial. Nobody testified and said I called Mr. McCord. Nobody produced a letter. There was talk of a letter, but it was never produced. It was never produced. Isn't that the fact? And neither was a person produced that said I wrote a letter. So there was no evidence. The only evidence of contact between Mr. McCord and the Reno Air Racing Association was in the year 2000, their representative, whose name was David Wilburn, came to Mr. McCord's – actually his friend's – he had two booths in that year. He came to his friend's booth and he said, hey, you guys are using my pylon. And Mike Leonard said to him, well, you know what, I don't have anything to do with this. I'm paraphrasing, obviously. You have to go talk to Mr. McCord. And he told him where Mr. McCord was. He was at the other booth. He never went to see Mr. McCord. No contact. Okay. The next year was 2001. Again, Mr. McCord had two booths. And again, Mr. David Wilburn came to see Mr. Mike Leonard and he said, I'm here to give you my annual harangue. I know there's nothing we can do about this, but, you know, we really wish you guys would come inside the gates and sell your airway submerging dyes instead of out here. And again, there was no contact with Jerry McCord. The very first contact with Jerry McCord was on September the 12th, the day before the TRO was issued. And I am reading directly from the trial testimony. And this is David Wilburn speaking at trial. After I purchased a shirt with what we felt were offending designs on it, use of our marks, I told him, you know, that basically this has gone far enough. This year we're going to have to take more definitive action. What was his reaction, if you recall? We didn't have extended conversation. I know he made, I'm sure, a very polite diplomatic response. I don't remember what it was. This is on the excerpts of the record, page 278, David Wilburn's trial testimony. So this was the very first contact that Reno Air Racing Association had with Jerry McCord directly. And how did Mr. McCord react? Did he react in any way unreasonably? No, he didn't. He reacted politely. And the next day they serve him with this temporary restraining order. He's in a crowd of like thousands of people are going by. He's handed a document which consists of pages 1 through 81 of the excerpts of the record. The process server hands him the document. And he's trying to, you know, he's in a crowd. And he's trying to pack up his merchandise, put it in boxes, close up for the night. He goes to dinner that night with his friends and his wife. And they try to make sense of this. And, you know, I would just like to point out to the court that, I mean, these are people who have never seen a legal pleading. I can remember the first time I saw a legal pleading. It was my first year of law school. I went to law school late in life. So it's not this case that makes me look so old. Anyway, it was my civil procedure class. And I had sort of gotten the hang of reading cases by that time. But the teacher had given us a supplement. And there's a complaint in there. And I go, holy cow, what's this? I can't handle this. And I look at it, and it was a complaint for the tie garment workers case, which was a very famous case in L.A. And, in fact, I had hosted a fundraiser for these people before I went to law school. So I was really interested. Like, oh, this is the tie garment workers case. But I could not make any sense of it. I, you know, I just couldn't handle it. So you've got to take into account that this is a person that's never seen a legal pleading. He's had no contact as to what they objected to. And, you know, he did the best he could to interpret the TRO. Well, in terms of issuing the TRO, there's a question raised about notice. Again, typically in intellectual property cases, people go in and at least get some kind of ex parte relief. What's your argument with respect to whether this needed to be an ex parte TRO? It didn't need to be an ex parte TRO. This guy was selling merchandise for – there was – okay, there's at least hard evidence in the record that he was selling from 1995. He was directly outside the gates of the event, 1999, 2000, 2001. He was a local business that had been continuously in operation since 1974 in Reno selling souvenirs. He was also – he's also a pilot, and so he's part of this aviation community. They had had contact with him, at least with his associate, in 2000 and in 2001. So there was absolutely no justification whatsoever on the 11th hour, on Friday the 13th, to go in ex parte without giving him any notice whatsoever. And then the other thing I'd like to point out is that the Court says in its decision, the Court states, in fact, during testimony at trial, the Court was persuaded in listening to the defendant and observing his demeanor that he did not find it particularly important to read the temporary restraining order as soon as it was served on him, nor did he make any substantial or concerted effort to seek legal advice until after the air show was completed. Accordingly, the Court finds that sanctions are appropriate to compensate the plaintiff for any losses sustained as a result of the defendant in failing to comply with the Court's temporary restraining order. The plaintiff shall be allowed reasonable attorney's fees relating to the issuance of the injunction, et cetera. And he did make an effort to find an attorney. It was a Saturday. He tried to call an attorney. He had never had any – he never had any reason for an attorney, even though he had been in the souvenir business since 1974. A souvenir business is always derivative of something. I mean, souvenir of San Francisco's got the Golden Gate Bridge on it or something like that. He had no reason to have an intellectual property attorney. He shows up in court Wednesday, the following Wednesday, 18th, and he submits an affidavit. I think this is page 83 of the ER, of the record. And he says – so on Monday and Tuesday, he said, I contacted four attorneys. Lara Pearson, she had represented RARA, had a conflict of interest, couldn't handle the case. Matt Addison, again, he had a conflict of interest. Herbert Chelsea, an intellectual property specialist who was a California attorney. He couldn't really represent him in Nevada. And Julian Smith from Carson City, who did represent him. Herbert Chelsea and Julian Smith officially represented him. So it's not true that he didn't make an effort. He made as much of an effort as I think anybody could. And the other thing that I think you've got to take into account when you say that he didn't make an effort, is that I think the court is saying that this guy is just looking for a loophole. And he's looking at this thing and saying, you told me I couldn't do this, but you didn't tell me I couldn't do that. Well, you've got to take that into account with the rest of the way he conducted himself through the litigation. How did the trademark holder prove consumer confusion? And consumer confusion is the most expensive thing a trademark holder has got to prove. They usually do it with surveys. They proved it by saying, Mr. McCord, were there any consumers who were confused? And he says, yes, there were. There were some people who were confused, and, you know, we told them it was not official Air Race merchandise. How did they prove that he sold his merchandise on Saturday and Sunday after the TRO was issued? Did they go there, take a picture or talk to him and say, hey, you're not supposed to do this? They did nothing. They proved it by, he said, well, this is the way I interpreted it, and did you continue to sell merchandise afterwards? Yes, I did. I continued to sell the rest of the Air Race merchandise, which I did not think I was prohibited from selling. Is there, it is a little confusing in the record. There is a picture of the T-shirt, I think it is. The color version. Can we look to see whether there's other, do you want to wait just a minute, I'll try to finish my question. No, I want to finish my question before you answer a question that's not before you. My question is this, we have a picture of the T-shirt. Are there other products that he was selling that didn't have the same depiction as the T-shirt? The other products that he sold were similar. This is where we get into confusingly similar. All of his products, in my understanding, all of them said Reno Air Races on it. And one of them, I think, said Reno and had the Reno arch, and then it said Air Races. But pretty much all of his merchandise, and they were different designs, had these elements. Reno Air Races, a pylon, and an airplane in some combination. Thank you. Are there other questions, or should I go ahead? Okay, so I was going on to the facts of this case, and I believe I've already stated that he'd been doing this for, since 1990, and that we also believe that this TRO was void from the get-go, ab initio. I can use plain English and I can use legalese, and one of the issues in this case is, you know, how legitimate is it to expect people to understand legalese. And this is the reason why I believe it was void of initio. Okay, to get this, to get the TRO, they go to the district court in Nevada, and Judge McKibben apparently is in Ohio, because he faxed back the signature page of the order, and it's got a 419 area code, which is in northwestern Ohio. So the declaration from Michael Houghton, who is the CEO and president of Reno Air Racing Association, says, I quote, this statement is misleading at best. Michael Houghton did not learn of Jerry McCord on September the 12th. He learned of him by his own testimony in trial at least of September 2000. So he knew of him, we know for sure by his testimony, he knew about him for two years. Okay, and then the attorney for the Reno Air Racing Association, his declaration states, plaintiff believes the TRO must issue without notice because of the immediate irreparable harm that will occur if the restraining order is not immediately issued, and because of the significant risk that defendant may leave the Reno State Airport premises and destroy or conceal their infringing merchandise once they receive notice of the law. In my experience, this is a common occurrence dealing with infringers at one-time famous events such as Reno Air Races. This was not a one-time event. It was a yearly event, and Jerry McCord had shown up right outside the gates of the event for three years in a row. He also had a going business that had been going since 1974 in the Reno area, and there was just absolutely no justification or any reason to say that this guy was going to disappear into the woodwork, because he wasn't. And in order to do that, I mean, you've got to come up with some, you can't just make a generalization that, well, people disappear, I mean, they would have to come up with some reason to say that this particular individual might disappear, and they had no reason whatsoever to say that. If anything, he's being held in contempt because he thinks, and he's been told by his attorneys, that Reno Air Races is a generic term, and he's got every right to use it. Finally, on the issue of the genericness, and most of this case was a generic case. I was actually argued on genericness of Reno Air Races. You know, when I got this case, as I said, Herb Schultz, his bar number is lower than God, and I'm reading the cases and I'm thinking, I don't understand this, the Ninth Circuit says generic plus generic does not equal generic. How are they saying that Reno Air Races is generic? And I'm not arguing that it is, because I don't believe that it is. I don't believe that the Ninth Circuit would believe that it is. But there's a case that I brought with me, and I have a copy for the Court, I have a copy for Mr. Francis. It's called Boston Athletic Association v. Mark Sullivan. It's really an interesting case. It's not on point. Well, let's put it this way, this case, if it's not on all threes, it's on all fours in terms of the facts. I mean, if it's not on all fours, it's on all threes in terms of the facts. It's not really on point in terms of the law. But this is a case about a guy whose name is Mark Sullivan, he's the Jerry McCord in this case, who's selling Boston Marathon T-shirts. And the Boston Athletic Association sues him. And the district court gives Mark Sullivan summary judgment in his favor. This is a 1989 case. Then the case goes up to the First Circuit, and the First Circuit reverses, and they give summary judgment to Boston Athletic Association. And one of the things that they cite in this case is a law review article in Texas Law Review. It's a 1984 article about promotional goods. And as of 1984, at least, this area of promotional goods was very murky in the law. Those of us who are over 50 remember that, you know, years ago, and I remember my mother saying this, like, why would you wear something that was advertising someone else's product? You know, young people probably can't believe this, that, you know, people didn't go around with, you know, T-shirts advertising things. So as of 1984, it was murky. I mean, my father had a small business, and I can imagine if people were going around with Auburn Appliance T-shirts, he would have thought this was great. So, I mean, generally, trademark infringement, it's like it's a bad thing. But at one time, the idea that somebody was promoting someone else's goods or event was not considered so bad. It was murky. So I think that kind of explains why Jerry McCord believed this was not infringement. This explains why his attorneys were so adamant that Reno Air Races was generic and was not infringement, and that all these facts have to be taken together. A guy who is doing something for 12 years, the Reno Air Races doesn't say boo to him. There's no objection. And then he slammed the TRO on a Friday night in the middle of this event, which he has invested some money in. He does his best to interpret it. He interprets it the way he understands it, and he's wrong. But he's not a contender. He's not playing fast and loose with the court. And I don't think that the district court, under a clear and convincing standard, should have found this man in contempt. And I'd like to save the rest for rebuttal. Thank you. May it please the Court. My name is Matthew Francis. I represent the Reno Air Racing Association. I would like to address the opening comments made by opposing counsel with regard to contempt. First, I'd like to address the point that no dialogue had been made between the parties for some 12 years. And I would like to address the point that Mr. McCord had made in 2000 that's undisputed. Prior to that time, Mr. McCord had allegedly sold some T-shirts to a souvenir shop and to a small casino in Reno, Nevada. There was no evidence presented at trial that Mr. McCord actually sold those T-shirts in 1990 to a souvenir shop. In 1995, Mr. McCord sold, allegedly, 24 T-shirts. So that's kind of irrelevant, really. The fact is they knew at least since 2000, correct? That's right, Your Honor. And with regard to the dialogues beginning in 2000, Reno Air Racing found out about him in 2000 and approached him at the air races. Also in 2000, Mr. McCord testified during his deposition that he had received a telephone call from an attorney representing the Reno Air Racing Association complaining about his use of both the Reno Air Races mark and the Pylon logo mark, which are the subject of this dispute. Let me stop there just to clarify. Is there actually a federally registered trademark on Reno Air Racing? There is not. There is one pending, Your Honor. There are two federal registrations for the Pylon logo, the 146 registration and the 796 registration. And so in 2000... So the only mark, the only federally registered marks are these Pylon ones? That's right, Your Honor. And that's really... The full name of the air races was something like National something or another? That's right, Your Honor. One of the things you were trying to get him to be enjoined from was Reno Air Races, correct? Yes, and he is enjoined, and in the appellant's opening brief, I believe, they're not disputing the permanent injunction with regard to Reno Air Races because that allegedly doesn't do him any harm. It's really the Pylon logo that we are concentrating on here. It was made by way of a Reno Air Racing representative speaking with Mr. McCord's assistant, Mike Leonard, at the air races, letting him know that there was an objection. Also, there was the telephone call. Similarly, in 2001, there was another objection made to Mr. Leonard at the Reno Air Races. He was satisfied that he knew about these objections, but he never could have told it to the attorney. He never contacted the Reno Air Races about it. He just kept on... There was never a letter from Reno Air? Well, that's disputed. Do you have a letter that you can show the Court that says a cease and desist letter, or we object to your use? I do not have a letter, Your Honor. Let's say there's no letter, then. Okay. If you had one, I'd like to look at it. That's fine with me. So there was dialogue prior to September 12, 2002. And Appellant's counsel, in her opening remarks, said that when he received the TRO, he didn't know what it meant. And there were thousands of people around milling about. He was trying to close up shop at 435 or 445. But the language of the TRO, we believe, was plain. The pylon logo was referred to in the TRO, as was the Reno Air Races mark, and the Exhibit F to the house. Let me just take the issue of notice, which is the one that troubles me, and maybe you can help me out on this. They knew since 2000 that he was selling the stuff. They knew where he lived. They apparently knew the attorneys knew it was DBA Western Sales for some reason. So they knew where it could be located. And he was apparently out there selling this stuff on the day the TRO was issued, correct? Yes, he was. The race was going on. That was part of the weekend. Yes, that's right. So what's the harm of saying we're going to be in Federal court at noon, Mr. McCord, and we're giving you notice that we're going to be there in connection with alleged trademark infringement, you know, be there, be square, and we're going to be there. What's the harm of notice in this kind of a situation? Well, Mr. Rounds in his declaration stated that it's common practice for defendants to fold up shop, take their wares, and move out, to basically flee. And so we couldn't catch them. And they're selling, who has a business, who's resident there. Right. Well, and Mr. McCord had previously allegedly sold T-shirts to souvenir shops, to small casinos. There was a risk that he would take his wares from the Reno Air Races, fold them up, close up shop, and never come back and sell them under the radar like he had allegedly done before. But is there any realistic risk, given that he's been there for two years, that he has a business, he's from Reno, he's a businessman? I mean, this isn't, you know, a case of somebody that nobody's ever heard of or had any contact with. Well, I think that notice or no notice, Mr. McCord's activities after he received the TRO are indicative why notice, whether or not. Well, he didn't flee. He didn't flee, but he sold the. He didn't destroy the merchandise. He sold the exact same merchandise prohibited by the TRO. Well, that's, you know, see, the problem with that argument is that just presumes the TRO is valid. And to the extent that he was selling stuff, that raises another question in my mind, is whether even if notice, you could conceivably say no notice in this circumstance, isn't the TRO fairly broad? In other words, if your real concern is that he's going to destroy goods, then why not have a preservation order in terms so you've got evidence of the use of the mark? Well, Your Honor, I believe that the word preserve is in the TRO. Yeah, but so is, you know, selling, manufacturing, and a thousand other things, the things that you put normally in a preliminary injunction. The. I mean, if your real concern, what you say, is he might fold up shop and destroy the stuff, then why, given that it's a hearing, you know, normally in this country, one of the best parts of the justice system is everybody gets to show up and argue, and then Mr. McCord could have said whatever he wanted to say. But in the TRO, you don't get, in the next party TRO, you don't get that chance. So given that he's not there, why isn't the order overbroad, at least to the extent it goes beyond an order of preservation? Well, it's not overbroad because he's selling these T-shirts with marks that have been used since 1964. Right, and if there's a problem, you can get monetary compensation for that. He's been doing it for at least five years by that point. And with your client, if there's a royalty or some kind of a penalty for intentional infringement, you'd get damages for that, right? Well, we could get damages. You're talking about three days, five days. There potentially could be damages, but there's also this continuing dilution of the marks at issue. Well, he's been doing it for five years, so if you had a problem, if you honestly believe that, I think you'd be kind of hard-pressed to show up in front of Judge McKibben and say, I'm worried about dilution, but I haven't done anything for five years. Well, we didn't know about him since we knew about him since 2000. Okay, so four years? Well, it was less than three years, actually. But in our practice in Reno, as you can appreciate, there's a lot of instances where there are fly-by-night organizations that sell all kinds of infringing wares who come in, infringe a trademark or service, infringe a trademark or perform some other kind of intellectual property violation, just flee right away. But there was no evidence that this was such a guy. I mean, is it enough for an attorney to wave your hand and say, well, typically in trademark cases, somebody, you know, we have fly-by-night people, so I'm worried about him being fly-by-night, therefore no notice. The real question is how much, what kind of a record do you have to lay out to get an ex parte order. And I appreciate your position because it's true, judges will sign anything. I mean, there's a lot of ex parte orders come in, the judge signs it, and everybody says, oh, this guy is falling, this is terrible, you know, he's going to flee, he's got an airplane, he'll probably be in Hong Kong by morning. But we don't really have any evidence of that here. That's the only thing that concerns me. I understand, Your Honor. Is there anything other than that general statement of that trademark infringers often pack up and leave? Well, that is the main statement in Mr. Round's declaration. So we should look, we should take a look at Mr. Round's declaration for that. Okay. Yes, Your Honor. And with regard, while we're talking about declarations, I'd like to also talk about Mr. Houghton's declaration, who is the president of the Reno Air Races. In the opening argument, appellant's counsel stated that Mr. Houghton, Mr. Houghton's declaration basically deceived the court because it states that that was the first time he ever knew about Mr. McCord. Mr. Houghton's declaration, in fact, actually discusses, basically states that that was the first time that they, that he had learned about Mr. McCord's activities at that time regarding the sale of the T-shirt on September 12th, 2006. So what you're saying is today is the first day I learned about today. No, today is the first day I learned about the sale of the T-shirt that's in question. Okay. So he never knew, Reno Air Racing didn't know in 2000, and what dates did we say that they were? 2000 and 2001 at the air show. He wasn't selling T-shirts there. No, they knew about that. But the declaration says that the first time we learned about Mr. McCord selling the T-shirt at issue in this case was on September 12th, 2002. That's the main point. Slicing it pretty thin, isn't it? Well, I don't think so because. It's like saying, well, the first time I learned about him selling the T-shirt today, September 12th, was today. Well, that was the first year that that T-shirt had been offered, which is Exhibit F to his declaration. So that's really what he was talking about. It wasn't that this was the first time that we had ever learned of Mr. McCord. That's just not the case. Do you think it might have made a difference if he said to the judge, well, we've actually been in touch with him a couple times. We told him we didn't like this. We told him once. We told him twice. And we found out he's still selling this stuff. The judge might have said, well, have you written him a letter? Or have you laid out your legal position in writing? Or have you given him notice? Is there any reason you couldn't bring him in here? Do you think it would have made a difference if the history of the dealings with Mr. McCord had been laid out? I don't know what the judge would have done. But given the strength of the Reno erasers mark, given the strength of the pylon logo mark, that incontestable mark, I don't think it would have made a difference to Judge McKibben, Your Honor. I'm not Judge McKibben, so I don't know specifically. But I'd like to address an issue with regard to what other merchandise was sold in addition to that T-shirt after the TRO was entered and served. And I'd like to refer the Court to our supplemental excerpts of record, page 356, which is a copy of a photograph of a coffee mug, which has the exact same picture on it as the T-shirt that he was enjoined from selling. So he kept selling the T-shirt after the TRO was served. And it was his testimony that he believed that he was only enjoined from selling that T-shirt. But he kept selling it anyway. And he sold a mug for the rest of the Reno erasers that had the exact same design on it. So I believe that... So just to be clear, even though he said he thought it only applied to the T-shirt, he still kept selling the T-shirt. He still kept selling the T-shirt after he was served. And then he said it was only the T-shirt, but he sold the mug. No, wait. He kept selling the T-shirts on the day he was served. I understood that he quit selling them the next day. That's right, Your Honor. Except your point is that he continued selling other stuff, one being a mug that had the exact same image on it as the T-shirt. That's right, Your Honor. But on the day he was served, wasn't he packing up? He was packing up his shop, allegedly, but he didn't even bother to read the TRO until that night. The statement you made is a little bit like the statement, if I only learned about it on the 12th. You said, despite the injunction, he kept selling the T-shirt. So was he packing up and closing down on the day the TRO arrived? Or was he, once he received the TRO, was he also selling? His T-shirt, his testimony, Your Honor, was that he was both packing up and selling. It was the end of the day. He was getting ready to fold up shop and go have dinner or whatever he was going to do. But as he was doing that, people were still coming by interested in purchasing merchandise. Do you have any evidence of how many he sold that day after he received the document? I believe it's in his deposition testimony. I know it's in our brief with regards to the number of those T-shirts that he had sold and the number that he had printed. No, that's not really my question. The question is, do we have any evidence of what T-shirts he sold, if any, as he was packing up and after he got the piece of paper? I believe that's in his deposition testimony in the excerpt to record. When you're using the term packing up, are you talking about at the end of each day he took his goods and then brought them back the next day and set up shop the next day? That's my understanding, Your Honor, yes. Another point that was made by Appellant's counsel in her opening remarks was that Mr. McCord did try to find an attorney on that day or the subsequent day, the Saturday. But I think it's relevant that he did not retain an attorney until two weeks after he was served with those papers. Well, you guys kind of conflicted him out of half the people he contacted, so it wasn't his fault. He could have called Las Vegas. He could have called Carson City. He should have opened a phone book and called A for an attorney. He could have called the Nevada Lawyer Referral Service. I think there were many options that were not explored. If the Court has no other questions, I have no other statements. Thank you very much. Thank you very much. I would just like to clear up a few things. Judge Alacon, you asked about packing up the goods. You have to understand that he's in a parking lot and, you know, he's outside and all these vendors, they, you know, we've all been to, like, flea markets and people pack up their goods. As far as what he sold, he actually doesn't even know what he sold. He assumes that he sold that T-shirt because it was a popular item, and so he thinks he sold it. That's in his deposition. Again, that's he, Jerry McCord, handing them their evidence on a silver platter. Isn't that okay in a civil case that you can call? Pardon? In a civil case, can't you call the opposing party and have them establish their position? Oh, of course. I'm just saying that this guy's being up front. He's not playing fast and loose. He's just saying, you know, yeah, yeah, I think I probably did sell those T-shirts. Well, that's good he was honest since he was under oath. I mean, if he was honest, all I'm trying to say is if this guy is being up front and being honest about what he did that was a violation of the TRO or infringement, that he was probably honest about his interpretation of what the TRO meant, which he interpreted to mean that he was restrained from selling that particular offending T-shirt. And I love the way these facts. Your time has expired, so sorry. The briefing is very helpful on both sides. Thanks to both counsel. The case of Reno Air Racing v. McCord is submitted.
judges: Alarcon, McKeown, Holland